IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JESSICA LYNN HUTH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 08-204 Erie |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

Plaintiff, Jessica Lynn Huth, commenced the instant action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security, who found that she was not entitled to supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. Plaintiff filed an application for SSI on March 3, 2005, alleging disability since October 1, 2004 due to herniated discs, anxiety and depression (Administrative Record, hereinafter "AR", at 15; 54-55). Her application was denied and she requested a hearing before an administrative law judge ("ALJ") (AR 41-45; 47). A hearing was held on May 1, 2007 and on September 26, 2007, the ALJ found that Plaintiff was not disabled at any time through the date of his decision, and therefore was not eligible for SSI benefits (AR 15-22; 262-281). Plaintiff's request for review by the Appeals Council was denied (AR 4-7), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for summary judgment. For the reasons set forth below, the Defendant's motion will be granted and the Plaintiff's motion will be denied.

### I. BACKGROUND

Plaintiff was born on April 5, 1974 and was 33 years old on the date of the ALJ's decision (AR 21). She is a high school graduate and has past relevant work experience as a hostess/cashier, laborer/stocker and telemarketer (AR 21; 55). Plaintiff has claimed disability due to both mental and physical impairments.

1

Plaintiff began treatment with Bradley Fell, M.D. at the Seneca Medical Center on October 9, 2003 (AR 201). She stated that she was depressed, fatigued, stressed, irritable, tearful and had hateful thoughts (AR 201). She reported low self-esteem and problems with concentration and decision making (AR 201). Plaintiff also complained of some numbness in her lower extremities (AR 201). Dr. Fell assessed her with fatigue and obesity and discussed diet, exercise and surgery options (AR 200). He encouraged her to follow a good diet and engage in regular exercise (AR 200). He prescribed Lexapro for her complaints of depression (AR 200).

At an intake interview on January 20, 2004 through the Venango County MH/MR Administration, Plaintiff reported a history of abuse from her mother and a history of several destructive relationships (AR 227). She lived with her two children and was unemployed (AR 227). Plaintiff indicated that she loved her most recent job and wished she had stayed at that job. (AR 228). At the time of the evaluation she was taking math and computer courses through the New Choices program and enjoyed all types of arts and crafts (AR 228). She complained of depression and difficulty concentrating (AR 229). The interviewer recommended that she undergo a psychiatric evaluation and individual outpatient therapy (AR 230).

Plaintiff returned to Dr. Fell on February 25, 2004 and reported numbness down her left leg and arm (AR 199). She reported that her weight caused her a lot of problems (AR 199). Plaintiff informed Dr. Fell that the Lexapro had not helped her symptoms of depression, but that she did not want him to treat her symptoms; rather, she had an appointment with the Regional Counseling Center for treatment (AR 198). Dr. Fell ordered x-rays of her cervical and lumbar spine and advised her to watch her diet (AR 198).

On April 6, 2004 Plaintiff continued to complain of left arm and leg numbness (AR 196). She was reluctant to discuss her weight, and Dr. Fell noted she was "avoidant" and would not talk much during the visit (AR 196). On April 14, 2004, an MRI of the Plaintiff's lumbar spine revealed a small broad based central disc herniation at the L4-L5 level causing mild impingement upon the mid anterior thecal sac, but no significant foraminal narrowing was identified (AR 111). An MRI of her cervical spine on the same date revealed normal spinal alignment, normal bone marrow signal intensity and a normal spinal cord (AR 112). At the C5-C6 level, there was very minimal disc bulging, but no formaminal or spinal canal narrowing (AR 112). Plaintiff

complained of severe back pain on April 23, 2004 and Dr. Fell prescribed Effexor (AR 195).

Plaintiff attended seven physical therapy sessions from May 6, 2004 through June 16, 2004 for her complaints of lower back pain. Discharge notes reflect that Plaintiff's goals were only partially attained and that she was discharged from therapy due to non-attendance (AR 114).

Plaintiff underwent a psychiatric evaluation performed by David Fontaine, D.O. from the Regional Counseling Center on May 12, 2004 (AR 218-219). Plaintiff reported a history of depression and anxiety (AR 218). Plaintiff further reported a number of emotionally devastating relationships (AR 218). On mental status examination, Dr. Fontaine reported that Plaintiff's affect was bland and she expressed feelings of hopelessness, helplessness and loneliness, but she spoke in a clear and concise fashion, there was no evidence of hallucinations or delusions, her memory was intact, her fund of knowledge was quite good, her insight was reasonably good and her judgment was intact (AR 218). Dr. Fontaine diagnosed her with dysthymia versus major depression, severe, recurrent; mild anxiety disorder; mixed personality traits; and obesity (AR 218). He assessed her with a current and past year Global Assessment of Functioning ("GAF") score of 60 and prescribed Xanax (AR 218).[1]

Plaintiff returned to Dr. Fell on June 24, 2004 for follow-up (AR 193). She inquired about bariatric surgery and reported that her physical therapy regimen had not helped (AR 193). She complained of foot and ankle pain, back pain and increased depression (AR 193). Dr. Fell prescribed a different physical therapy program and referred her to a podiatrist (AR 193).

On July 26, 2004, Plaintiff complained of increased muscle spasms, neck pain and back pain (AR 191). Dr. Fell diagnosed her with back pain, herniated disc at L4-5 and degenerative joint disease of the cervical spine (AR 191). He prescribed Skelaxin, Naprosen and a heating pad for her complaints of pain (AR 191). He also prescribed an exercise program at Curves (AR 191).

---

[1] The GAF score considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. It represents "the clinician's judgment of the individual's overall level of functioning." *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed. 2000). Scores between 51 and 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id*.

Plaintiff attended three physical therapy sessions from August 4, 2004 through September 9, 2004 (AR 100). Her pain had reportedly decreased significantly by her last session (AR 100). Plaintiff's strength was 4/5 throughout, her cervical range of motion was within normal limits and her lumbar range of motion was within normal limits, with the exception of some limited side bending and bilateral rotation (AR 100). Discharge notes reflect that Plaintiff's goals were again not met because she "did not attend physical therapy due to having too busy of a schedule and having too much going on at [that] time" (AR 100).

Plaintiff was evaluated by Anita Courcoulas, M.D. for bariatric surgery on September 13, 2004 (AR 188-189). Dr. Courcoulas reported that the Plaintiff was morbidly obese with a body mass index of 50 (AR 190). Dr. Courcoulas recommended she undergo a preoperative work up to include sleep studies, an upper GI study, and a nutrition and psychological evaluation (AR 190). Plaintiff understood the risks of the surgery and elected to pursue the preoperative work up (AR 190).

On October 5, 2004, Plaintiff reported to Dr. Fell that she intended to follow through with gastric bypass surgery for her obesity (AR 187). She was assessed with back pain and obesity, referred to physical therapy and given Skelaxin samples (AR 187). On October 20, 2004 Plaintiff reported suffering from "extreme" lower back pain after she "overworked" herself (AR 186). Dr. Fell prescribed Ultram and referred her to a pain clinic (AR 186).

Plaintiff attended five physical therapy sessions between October 18, 2004 and November 15, 2004 (AR 88). It was reported that goals were not met secondary to the Plaintiff's limited attendance (AR 88). Plaintiff was discharged on November 22, 2004 after she contacted the facility and informed them that she would not be continuing therapy (AR 88).

On November 18, 2004, Plaintiff was seen by Dr. Fell and complained of acid reflux (AR 184). Plaintiff requested that he complete the necessary forms for gastric bypass surgery (AR 184). She was assessed with obesity, back pain, anxiety/depression and GERD, and was provided samples of Protonix (AR 184).

Plaintiff returned to Dr. Fontaine at the Regional Counseling Center on November 24, 2004, who reported she was doing well on her medication (AR 221).

On December 3, 2004, Plaintiff telephoned Dr. Fell's office requesting a permission slip

4

to use the exercise equipment at the YMCA; Dr. Fell signed a permission slip stating she could engage in activity as tolerated (AR 182).

On December 12, 2004, Albert Scott, Ed.D., performed a neuropsychological evaluation in order to establish a diagnosis and formulate treatment goals (AR 82-85). Her dates of consultation with Dr. Scott were October 20, 2004, October 29, 2004 and November 16, 2004 (AR 82). Plaintiff reported that she had been kicked in the head by a deer at age 13 and lost consciousness (AR 83). Plaintiff further reported a previous psychiatric hospitalization for a suicide attempt as a teenager (AR 82-83). Dr. Scott noted that she was obsessed with having gastric bypass surgery (AR 83). She complained of suffering from sleep and appetite problems, anxiety, depression, difficulty making decisions and social withdrawal, as well as violent behavior and suicidal thoughts in the past (AR 83). Plaintiff also complained of back and neck pain, which was exacerbated by excessive lifting or stressful activity (AR 83). Her medication regimen consisted of Zanax, Naproxen and Skelaxin (AR 83).

Dr. Scott administered a number of psychological tests, noting that at times during testing Plaintiff was hostile and aggressive (AR 83). Test results from the Wechsler Memory Scale-Third Edition (WMS-III) revealed problems with her working memory, and Rorschach Inkblot Procedure (RIP) results were indicative of paranoia, post traumatic stress disorder, an affective disorder and psychosis (AR 84). Plaintiff scored in the average range for receptive vocabulary and expressive vocabulary (AR 83).

Dr. Scott recommended that Plaintiff undergo a neurological evaluation, as well as an EEG, MRI and SPECT studies (AR 85). He recommended she thereafter be referred to a psychiatrist for her "numerous" psychiatric problems, and that she undergo drug and alcohol counseling, mental health counseling, trauma therapy and anger management classes (AR 85). Dr. Scott opined that "[w]ithin a reasonable degree of professional certainty" Plaintiff was "psychiatrically disabled" and that "numerous issues" needed to be resolved before she underwent gastric bypass surgery (AR 85).

Plaintiff returned to Dr. Fell on January 10, 2005 and reported that she was doing well and had lost weight, going from 267 pounds to 254 pounds (AR 180). Dr. Fell advised her to continue with a healthy diet and exercise program (AR 180).

On February 17, 2005, Plaintiff reported that she was exercising three days a week at the YMCA and was watching her diet (AR 178). She was assessed with marked obesity and advised to keep a diary recording her food intake and exercise activity, and was advised exercise daily (AR 178).

Plaintiff reported to Dr. Fell on March 9, 2005 that she did not completely agree with all of Dr. Scott's evaluation of her and did not view her depression as a major health problem (AR 174). She reported that her "biggest problems" were her mother, that she could not pick the right man and back pain (AR 174). She recounted her head injury at age 13, and noted that Dr. Scott recommended she see neurologist for her memory loss issues (AR 174). Dr. Fell diagnosed her with depression, memory loss, and head injury as a child (AR 174). On March 23, 2005, Plaintiff had a seven pound weight loss (AR 176). She was advised to continue a healthy diet and engage in regular exercise (AR 176).

On an undated Bariatric Surgery Pre-op Psychological Assessment form, Dr. Fontaine diagnosed the Plaintiff with dysthymia, generalized anxiety disorder, mixed personality traits and obesity, and assigned her a GAF score of 60 (AR 173). He approved her for bariatric surgery, indicating she was a "good candidate" (AR 173).

An MRI of the Plaintiff's brain dated April 7, 2005 showed no brain abnormality (AR 87). On April 28, 2005, Plaintiff reported to Dr. Fell that she was trying to be more active around the house, but that bending forward caused back pain (AR 170). She indicated that she engaged in stair climbing and had lost six pounds (AR 170). She was to continue her diet and engage in regular exercise (AR 170).

Plaintiff returned to Dr. Fontaine on May 11, 2005 who noted Dr. Scott's concerns about her anxiety treatment with Xanex (AR 220). Dr. Fontaine noted that the Plaintiff's last prescription was in November 2004 and that she only used it on an as needed basis, approximately every other day (AR 220). Dr. Fontaine concurred with Dr. Scott's suggestion that she see a neurologist for her memory loss (AR 220).

Plaintiff was evaluated by James McLaughlin, D.O., a neurologist, on May 25, 2005 (AR

205).[2]  He noted the Plaintiff's MRI revealed no abnormalities and stated that general screening did not reveal significant memory dysfunction (AR 205).  Dr. McLaughlin suspected her memory problems were related to her underlying personality disorder (AR 205).  He noted her previous head injury with loss of consciousness by way of history, and recommended she undergo an EEG (AR 204).  An EEG study conducted on June 8, 2005 was normal (AR 204).

On May 31, 2005, Plaintiff reported to Dr. Fell that she had not engaged in regular exercise due to significant back pain but had planned to restart (AR 169).

Plaintiff underwent a consultative evaluation performed by Thomas Chesar, M.D. on June 21, 2005 (AR 129-135).  She reported suffering from depression, anxiety and back pain (AR 129).  She relayed two previous suicide attempts with corresponding inpatient psychiatric treatment, as well as three courses of physical therapy that she did not complete (AR 129-130).  She claimed she suffered from increasing neck pain but had not seen a physician (AR 130).  Plaintiff noted that she gained a significant amount of weight over the course of her two pregnancies, but had lost approximately 31 pounds since December 2004 (AR 130).  She stated that she took Xanex, Flexeril and Napoxen as needed (AR 131).  She reported short term memory problems, but claimed that she kept an appointment book to help her compensate in that area (AR 130).  Her back pain was exacerbated by lifting heavy furniture and wearing high heels but medication helped her pain  (AR 131).

On physical examination, Dr. Chesar reported that Plaintiff was morbidly obese with a body mass index of 43, was in no apparent distress and was alert and cooperative (AR 132).  He found that her neck was mildly tender to palpation diffusely but there was no cervical adenopathy (AR 132).  Her back was tender to palpation over the occipital area, the paraspinal musculature in the low thoracic and lumbar regions, in the musculature lateral to the lumbar area and over the left SI joint (AR 132).  No tenderness was found on the right SI joint, upper thoracic or lower cervical area and no spasm was noted (AR 132).  Dr. Chesar reported that her cranial nerves were intact; she exhibited 4/5 strength bilaterally on hands, knee extensors and ankle plantar flexors; strength was 5/5 bilaterally in her biceps, deltoids, knee flexors and ankle dorsiflexors; and strength was 3/5 bilaterally in her triceps (AR 132).  Dr. Chesar assessed Plaintiff with chronic

---

[2] Dr. McLaughlin is of no relation to the undersigned.

low back pain, morbid obesity, depression, anxiety and short-term memory loss (AR 133). He noted that she appeared to be "under treated" for her anxiety issues, was not aggressively working at weight loss and was not on any medication for her musculoskeletal pain (AR 133).

Dr. Chesar completed a Medical Source Statement of the Plaintiff's ability to perform work-related physical activities and opined that she could lift and carry up to 10 pounds frequently and up to 25 pounds occasionally; stand and walk 6 hours or more; sit 8 hours with a sit/stand option; and occasionally bend, kneel and climb but never stroop, crouch or balance (AR 134-135). Dr. Chesar further found Plaintiff had no limitations in her pushing and pulling abilities and he imposed no environmental restrictions (AR 134-135).

On June 25, 2005, Plaintiff was psychologically evaluated by Glenn Thompson, Ph.D. pursuant to the request of the Commissioner (AR 136-136-147). Plaintiff relayed the history of her illnesses and current symptoms (AR 136-137). She stated that she only took her medication when it was "really needed" (AR 137). Dr. Thompson noted that in spite of her periodic usage, she found her medications helpful (AR 139). Plaintiff expressed a fear of others, including an emotionally abusive ex-boyfriend, and also reiterated her problems with her weight (AR 138). Although the Plaintiff claimed she had been depressed for a long time, she felt her condition had improved (AR 138). Plaintiff stated that she last worked as a telephone operator at a catalog company and received compliments on her work, but had resigned due to her physical problems (AR 138).

On mental status examination, Dr. Thompson found Plaintiff's hygiene was adequate, she maintained effective eye contact, there was no significant shifts in anxiety level during the evaluation and she exhibited no unusual behavior or psychomotor activity (AR 140). Dr. Thompson reported that her affective expression was "essentially depressed with vegetative symptoms of depression-marked" and that she had difficulty "initiating, sustaining or terminating an emotional response" (AR 141). He noted that her affect was depressed but appropriate to thought content and the situation (AR 141). Plaintiff denied any hallucinations, but stated that she felt people tried to take advantage of her, misinterpreted her facial expressions and were "looking at her and thinking bad thoughts" (AR 141-142). Dr. Thompson found her abstract thinking was mildly compromised, she had defective information ability and her concentration

8

was compromised (AR 142-143).  Most of her memory skills were intact but her immediate attention and recall was below average (AR 143).  Dr. Thompson noted that Plaintiff had problems with impulse control and had several instances of defective social judgment (AR 143-144).

Dr. Thompson diagnosed the Plaintiff with major depression, moderate, recurrent; generalized anxiety disorder; posttraumatic stress disorder; several physical problems including morbid obesity; and severe stressors regarding her custody battles with her ex-boyfriend (AR 144).  He assigned her a GAF score of 30 to 40, and with respect to her prognosis, found it unlikely that there would be significant improvement in the foreseeable future (AR 144).[3]  Dr. Thompson concluded that, with respect to the effect of her impairment on her ability to function, she was only mildly affected, in that she was able to shop, pay bills, take care of her personal care and hygiene and did not require any assistance taking her medication (AR 144; 146).  Regarding her social functioning, he found she had a "history of difficulties getting along with her mother," had only one friend whom she saw infrequently and "had made poor choices of boyfriends" (AR 144).  Although she kept to herself with respect to any interaction with co-workers, Dr. Thompson found that employers were "quite satisfied with her work" and she had never been fired (AR 144-145).  Dr. Thompson noted that Plaintiff's concentration was "variable" and found she was able to sustain attention long enough to read a book, watch television and prepare a meal, but had difficulty remembering appointments independently, completing assignments and sustaining work and work-like assignments (AR 145).

Dr. Thompson opined that Plaintiff was slightly limited in her ability to understand, remember and carry out short simple instructions and interact appropriately with supervisors; was moderately limited in her ability to understand and remember detailed instructions, make

---

[3]Scores between 21 and 30 indicates "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).  *Id*.  Scores between 31 and 40 indicate "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; ...)."  *Id.*

judgments on simple work-related decisions, and respond appropriately to changes in a routine work setting; and was markedly limited in her ability to carry out detailed instructions, interact appropriately with the public and co-workers, and respond appropriately to changes in a usual work setting (AR 145).

On July 25, 2005, Roger Fretz, Ph.D., a state agency reviewing psychologist, reviewed the evidence of record and found that Plaintiff was mildly limited in her daily activities, moderately limited in social functioning and in concentration, persistence and pace, and had experienced one to two episodes of decompensation (AR 158). Dr. Fretz completed a Mental Residual Functional Capacity Assessment form and opined that Plaintiff was "not significantly limited" in a number of mental work functioning areas and was only "moderately limited" in her ability to understand, remember and carry out detailed instructions, and maintain attention and concentration for extended periods (AR 161). He found Plaintiff's medically determinable impairments were major depressive disorder, generalized anxiety disorder and post traumatic stress disorder (AR 163). Dr. Fretz found that the Plaintiff was capable of performing activities of daily living (AR 163). He acknowledged that her ability to understand and remember complex or detailed instructions was limited, but concluded that she was capable of understanding and carrying out more simple instructions (AR 163). He found no restrictions in her adaptive abilities (AR 163). Dr. Fretz considered Dr. Thompson's report and concluded that he had overestimated the severity of the Plaintiff's functional restrictions (AR 163). He found Dr. Thompson's report was inconsistent with the medical and non-medical evidence in the file and therefore declined to give "great weight" to his opinion (AR 163). Dr. Fretz concluded that Plaintiff was able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairments (AR 164).

On June 29, 2005, William Barnes, a state agency adjudicator, reviewed the evidence of record and concluded that the Plaintiff could perform light work (AR 33-34). Mr. Barnes noted that Plaintiff had the ability to care for herself and maintain her home, and that her treatment for back pain had been routine and conservative in nature (AR 37). He further noted that she did not attend physical therapy and that medications had been effective in controlling her symptoms (AR 37). Finally, he reviewed Dr. Chesar's report and adopted his assessment (AR 37).

Plaintiff returned to the Regional Counseling Center on December 20, 2005 and reported to Janis Pastorius, PA-C that she continued to have trouble with relationships and weight loss (AR 224). Ms. Pastorius reported that her mood was depressed, her affect was appropriate to her mood and she was irritable, but her eye contact was good, her speech was clear and coherent, her thoughts were logical and well organized (AR 224). She also noted that the Plaintiff denied any hallucinations or suicidal or homicidal thoughts (AR 224). Plaintiff reported that she only used Xanex as needed and she was continued on this medication (AR 224).

On February 7, 2006, Plaintiff returned to Dr. Fell and reported neck pain and increased fatigue (AR 241). Plaintiff stated that for the past three months she had experienced neck stiffness, pain and discomfort (AR 241). Dr. Fell diagnosed her with cervical sprain and obesity (AR 241).

When seen by Dr. Fell on August 3, 2006, Plaintiff complained of neck problems and pain and swelling of her feet (AR 239). She indicated that she stopped exercising because her feet were sore and she requested another MRI of her neck (AR 239).

On August 7, 2006, Plaintiff was seen at the Regional Counseling Center and complained of some anxiety and occasional depression (AR 223). Her Xanax dosage was decreased and her Zoloft and Geodon dosages were increased (AR 223).

During a routine gynecological examination on February 28, 2007, Plaintiff reported anxiety and fatigue but denied suffering from any depression and stated her general health was good (AR 235). She stated she took Effexor in the past but it gave her suicidal thoughts (AR 235). Her weight was recorded at 246 pounds with a BMI of 46.5 (AR 235). Her examination was essentially normal, and the nurse practitioner noted that her affect was normal and that she was comfortable and cooperative during the examination (AR 235). Plaintiff indicated that she was going to start exercising at the YMCA (AR 236).

Plaintiff testified at the administrative hearing held by the ALJ on May 1, 2007 that she was single and lived with her two daughters aged twelve and four (AR 266). At the time of the hearing, she was 5'2" tall and weighed 220 pounds (AR 269). She suffered from back and neck problems, but had no problems with neck movement (AR 269). She acknowledged that her weight loss over the past two years had helped improve her back pain (AR 269). Plaintiff

testified that she saw a counselor and a physician approximately once a month for her mental health problems (AR 271). She took no medications and indicated that her mental health had improved (AR 271-272). While the Plaintiff testified that she had previously suffered from "excruciating" back pain, neck pain and had psychological problems that prevented her from working, she stated that she felt much better at the time of the hearing (AR 273). In fact, the Plaintiff testified that she felt capable of working and was scheduled for a job interview which had been arranged through the Maximum Participation Program through Venango County MH/MR (AR 271; 273). That program had been directed at improving her self-esteem, anger management, relationship skills and job readiness skills (AR 270-272).

The ALJ asked Samuel Edelmann, the vocational expert, to assume an individual of the same age, education and work experience as Plaintiff, who was able to perform sedentary work but could not engage in any repetitive bending, and was limited to working in a low stress environment, limited to simple, routine, repetitive tasks with no more than minimal contact with the public (AR 278-279). The vocational expert testified that such an individual could perform the sedentary jobs of a hand packer, sorter/grader and assembler (AR 279).

Following the hearing, the ALJ issued a written decision which found that Plaintiff was not eligible for SSI benefits within the meaning of the Social Security Act (AR 15-22). Her request for review by the Appeals Council was denied, rendering the ALJ's decision the final decision of the Commissioner (AR 4-7). She subsequently filed this action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

### III. DISCUSSION

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen*, 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117. The ALJ resolved Plaintiff's case at the fifth step. At step two, the ALJ determined that her morbid obesity, low back and neck pain, and depression and anxiety were severe impairments, but determined at step three that she did not meet a listing (AR 17-18). At step four, the ALJ determined that she retained the residual functional capacity to perform sedentary work with no repetitive bending and was limited to a low stress work environment involving simple, routine, repetitive tasks with minimal contact with the public (AR 18). At the final step, the ALJ concluded that Plaintiff could perform the jobs cited by the vocational expert at the administrative hearing (AR 21-22). The ALJ additionally determined that her statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible (AR 20). Again, I must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Plaintiff first claims that the ALJ failed to properly consider her obesity as required by Social Security Ruling ("SSR") 02-1p, which provides guidance for evaluating obesity-related claims. *See* SSR 021p, 2000 WL 628049. An ALJ is required to conduct an "individualized

assessment of the impact of obesity on an individual's functioning. *Id*. at *4. An individual with obesity may satisfy step three of the sequential analysis if obesity increases the severity of a coexisting impairment to the extent that the combination of impairments meets or equals the requirements of the listing. *Id*. at *5. An ALJ may not, however, make assumptions about the severity or functional effects of obesity combined with other impairments and must evaluate each case based on the information in the case record, since "[o]besity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment." *Id*. at *6.

Plaintiff argues that the ALJ failed to make findings or give reasons why she did not meet the "obesity ruling", citing *Burnett v. Comm'r of Soc. Sec. Admin.,* 220 F.3d 112 (3rd Cir. 2000). In *Burnett*, the ALJ's step three analysis consisted of the following discussion: "Although [Burnett] has established that she suffers from a severe musculoskeletal [impairment], said impairment failed to equal the level of severity of any disabling condition contained in Appendix 1, Subpart P of Social Security Regulations No. 4." *Burnett*, 220 F.3d at 119. The Third Circuit concluded that the ALJ's statement was so conclusory that it precluded meaningful judicial review. *Id*. at p. 119. As a result, it remanded the case to the ALJ for a discussion of the evidence and an explanation of the reasoning supporting his determination. *Id*. at 120.

In *Jones v. Barnhart*, 364 F.3d 501 (3rd Cir. 2004), the claimant alleged disability due to asthma and hives. The ALJ determined that the claimant's impairments did not meet or equal any listed impairment at step three of the analysis, but he did not mention any specific listed impairment or his rationale for rejecting them. *Jones*, 364 F.3d at 503. The Third Circuit held:

> *Burnett* does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function of *Burnett* is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review. In this case, the ALJ's decision, read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that Jones did not meet the requirements for any listing, including Listing 3.02(A). The ALJ's opinion discusses the evidence pertaining to chronic obstructive and restrictive lung disease, specifically referencing "[p]ulmonary function studies ... consistent with moderately severe obstructive and restrictive defects," but pointing to the lack of pulmonary complications, and a finding that claimant's lungs were clear. Also, the ALJ noted the claimant's medical history showed no frequent hospitalization or emergency treatments. This discussion

> satisfies *Burnett's* requirement that there be sufficient explanation
> to provide meaningful review of the step three determination.

*Jones*, 364 F.3d at 504-05.

      Here, the ALJ reviewed the medical evidence of record and noted that the Plaintiff weighed 220 pounds at the time of the administrative hearing but had weighed approximately 276 pounds two years prior thereto (AR 19). He observed that the Plaintiff reported that her weight loss had helped reduce her pain (AR 19). He further noted that the Plaintiff had previously considered bypass surgery, but had opted for diet and exercise instead (AR 20). In discussing her back condition with respect to her obesity, the ALJ found that her complaints were not entirely credible in that MRI's in 2004 demonstrated a tiny disc bulge at C4/5 and a disc herniation at L4/5, but there was no recent treatment or objective testing indicating whether this condition persisted (AR 20). He observed that she only sought treatment for back pain once in 2006 and 2007 and took no medication for pain (AR 20). Finally, the ALJ accommodated any alleged functional limitations with respect to the Plaintiff's obesity in combination with her back impairment by limiting her to sedentary work with no repetitive bending (AR 20). I find that the ALJ's explanation comports with the mandate of *Burnett* and *Jones*. *See e.g., Klangwald v. Comm'r of Soc. Sec.,* 269 Fed. Appx. 202, 204 (3rd Cir. 2008) ("After broadly concluding that [the claimant] 'has no impairment, which meets the criteria of any of the listed impairments,' the ALJ followed this conclusion with a searching review of the medical evidence. Under our precedents, this is sufficient."); *Chanbunmy v. Astrue*, 560 F. Supp. 2d 371, 381 (D.N.J. 2008) (holding that the ALJ's step three obligation "can be fulfilled by discussing the medical record after concluding that a claimant's impairments did not equal a listing").

      Plaintiff next argues that the ALJ erred in concluding that her mental impairments did not meet the Listings at 12.04, affective disorders, and/or 12.06, anxiety related disorders. Both of these Listings consist of paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations) and paragraph C criteria (a set of additional functional limitations). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A). The required level of severity for 12.04 affective disorders is met when "the requirements in both A and B are satisfied, or when the requirements in C are satisfied." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04. The required level of severity for 12.06 anxiety-related disorders is met when "the

15

requirements in both A and B are satisfied, or when the requirements in A and C are satisfied." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.06.

The ALJ found that Plaintiff failed to meet the B criteria (AR 18).[4] The paragraph B requirements of Listing 12.04 and 12.06 require at least two of the following:

> 1. Marked restriction of activities of daily living; or
>
> 2. Marked difficulties in maintaining social functioning; or
>
> 3. Marked difficulties in maintaining concentration, persistence or pace; or
>
> 4. Repeated episodes of decompensation, each of extended duration[.]

See 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04(B), 12.06(B). The term "marked" means "more

---

[4]The ALJ further found that Plaintiff's mental impairments did not meet the C criteria of Listing 12.04 or Listing 12.06 (AR 18). Listing 12.04 requires:

> C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms of signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1§ 12.04(C).
Listing 12.06 requires a "complete inability to function independently outside the area of one's home." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.06(C). Plaintiff does not challenge the ALJ's findings with respect to the C criteria.

16

than moderate but less than extreme," and a "marked limitation" is one that seriously interferes with a claimant's ability to "function independently, appropriately, effectively, and on a sustained basis." *See* 20 C.F.R. Pt. 404, Subpt. P, Appx. 1 § 12.00C. The ALJ found that the Plaintiff's affective disorder and anxiety-related disorder did not meet part B because the evidence reflected only mild limitations in performing activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and no episodes of decompensation (AR 18).

Plaintiff relies on Dr. Thompson's report wherein he concluded that she was markedly limited in her ability to carry out detailed instructions, interact appropriately with the public and co-workers, and respond appropriately to changes in a usual work setting (AR 145). The ALJ considered Dr. Thompson's opinion, but assigned little weight to his findings because he, as well as the other consultative examiner, did not consider evidence of the Plaintiff's improvement in her mental functioning due to counseling (AR 20).

The ALJ found that although the Plaintiff had some trouble socializing, she was able to get along with others, and, in fact, had been complimented on doing a good job (AR 20). Plaintiff herself reported improvement in her self esteem and that she was more effectively able to control her anger (AR 20). The ALJ observed that she took no medication for her depression or anxiety (AR 20). He also observed that the Plaintiff was able to care for an infant and older child, as well as maintain a house and her finances for herself and her daughters (AR 20). With respect to any deficiencies in concentration, Plaintiff testified that she was able to work in the past and was preparing to work again (AR 20). Indeed, the Plaintiff testified that her mental health had improved, she felt much better at the time of the hearing and had a scheduled job interview (AR 271-273). The ALJ accepted the Plaintiff's claim that memory problems continued to plague her despite gains in mental health counseling (AR 20). He accommodated her social and concentration shortcomings, by restricting her to jobs involving simple, routine work tasks in a low stress environment with no public contact, which adequately accounts for the limitations found by Dr. Thompson (AR 20). I find that substantial evidence supports the ALJ's conclusion that the Plaintiff's mental impairments did not meet Listing 12.04 and/or 12.06.

Finally, the Plaintiff argues that the ALJ failed to adjudicate whether she was entitled to a

17

"closed period" of disability. *See* Plaintiff's Brief pp. 17-18. In a "closed period" case, the ALJ determines that a new applicant for disability benefits was disabled for a finite period of time which started and stopped prior to the date of his or her decision. *See Waters v. Barnhart*, 276 F.3d 716, 719 (5th Cir. 2002). While the ALJ did not specifically use the words "closed period" in adjudicating the Plaintiff's claim, his decision and explicit findings reveal that he did, in fact, consider whether the Plaintiff was disabled "for a continuous period of not less than 12 months" and concluded that the Plaintiff "has not been under a disability withing the meaning of the Social Security Act since March 3, 2005, the date the application was filed" (AR 15; 22). The fundamental issue is whether or not the ALJ's conclusion that the Plaintiff was not disabled at any time since March 3, 2005 is supported by substantial evidence.

Plaintiff contends that the ALJ's decision to discount the opinions of Dr. Scott and Dr. Thompson on the basis of her improvement in her mental health symptoms was improper. However, the ALJ may appropriately reject a physician's opinion where there is later evidence of improvement. *See e.g. Torres v. Barnhart*, 139 Fed. Appx. 411, 415 (3rd Cir. 2005) ("In light of the later treatment notes, which undeniably set forth a consistent pattern of substantial improvement, including in the area of social functioning, the ALJ justifiably accorded less weight to Dr. Erro's and Mr. Sosa's GAF assessments as an inaccurate indicator of the *present* severity of Claimant's mental impairments") (emphasis in original); *Humphries v. Barnhart*, 183 Fed. Appx. 887, 890 (11th Cir. 2006) (holding that substantial evidence supported the ALJ's decision to accord less weight to the opinion evidence where, although the opinions were reasonable assessments at the time they were made, "they were not consistent with more recent evidence suggesting that her condition had improved with proper medical treatment, exercise, and medication"). Here, as set forth above, the Plaintiff testified to substantial improvement in her mental and physical symptoms, as well as an ability to work.

Moreover, substantial evidence supports the ALJ's conclusion that the Plaintiff was not disabled at any time during the relevant time frame. The Regional Counseling Center records, where Plaintiff has been treated for her mental health impairments since 2004 by Dr. Fontaine, consistently show that she suffered from only moderate symptoms and was never precluded her from working by Dr. Fontaine due to any mental impairments throughout the relevant time frame

(AR 173; 218; 220-221; 223-224). When initially evaluated by Dr. Fontaine in May 2004, while she reported a history of depression and anxiety, Dr. Fontaine found her memory was intact, her fund of knowledge was "quite good," her insight was reasonably good and her judgment was intact (AR 218). In November 2004, Plaintiff reported to Dr. Fontaine she was doing well on her medication (AR 221). Dr. Fontaine was of the opinion that the Plaintiff was a "good candidate" for bariatric surgery, in contrast to Dr. Scott's earlier opinion that she was "psychiatrically disabled" for purposes of undergoing the surgery (AR 173). In December 2005, while Plaintiff's mood was reported as depressed, Ms. Pastorius reported that her speech was clear and coherent, her thoughts were logical and well organized and Plaintiff herself reported that she only used her medications as needed (AR 224). In August 2006 she complained of only some anxiety and occasional depression, and during a routine gynecological examination in February 2007 Plaintiff denied suffering from any symptoms of depression (AR 235). Finally, Dr. Fretz, the state agency reviewing psychologist, found that Dr. Thompson's report had overestimated the severity of the Plaintiff's functional restrictions and revealed only a "snapshot" of her functioning (AR 163). He concluded that the Plaintiff was able to meet the basic demands of competitive work on a sustained basis despite the limitations resulting from her mental impairments (AR 164). Consequently, I find that the ALJ's decision is supported by substantial evidence.

## IV. Conclusion

Based upon the foregoing reasons, the Commissioner's final decision will be affirmed. An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JESSICA LYNN HUTH, )<br>)<br>Plaintiff, )<br>)<br>) Civil Action No. 08-204 Erie<br>)<br>v. )<br>)<br>MICHAEL J. ASTRUE, )<br>Commissioner of Social Security, )<br>)<br>Defendant. ) | |

## **ORDER**

AND NOW, this 15th day of January, 2010, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [Doc. No. 9] is DENIED, and the Defendant's Motion for Summary Judgment [Doc. No. 11] is GRANTED. JUDGMENT is hereby entered in favor of Defendant, Michael J. Astrue, Commissioner of Social Security, and against Plaintiff, Jessica Lynn Huth. The clerk is directed to mark the case closed.


						s/ Sean J. McLaughlin
						United States District Judge


cm: All parties of record. ____